Mr. Caruso, together again. I thought maybe this time I'd try to get it right. May I proceed? My adversary is out in the ante room. Where is he? He's sitting out in the ante room. Why is he doing that? I have no idea. What is his theory? I don't know, but this is a question of the state of mind of another person. Is this the person who is supposed to be on the other side? We really have quite a day here. Here he is. We don't usually experience this. Sir? Hello? Give us the pleasure of your company. Thank you. Sit down. Have you ever been in a court? Thank you. Shall I proceed, Your Honor? Yes. Yes, thank you. May it please the Court, Kenneth Caruso, for the appellant. My client is called Belneftekhim, the state oil company of the country of Belarus. Judge Kogan committed error here when, as a discovery sanction, as a discovery sanction, he refused to consider the statement of the Minister of Justice of Belarus. That statement addressed issues that went to a lack of subject matter jurisdiction. And, of course, the Court cannot ignore a lack of subject matter jurisdiction even as a discovery sanction. Let's look at . . . Didn't we say in the last, in Judge Radji's opinion, the last time this case was up here, that a sanction in the form of exclusion of evidence would be an entirely different matter than what the judge had done the first time around? Yes. As far as the defense? Yes. And Judge Kogan was free. I freely concede that Judge Kogan could have ignored the minister's statement on any issue other than subject matter jurisdiction. I mean, compare it to . . . compare it to the . . . Subject matter jurisdiction was the only issue that was at issue in that opinion. That's what we were talking about. Well, but you were also talking about evidence concerning ownership of assets, concerning these various factors . . . What about the evidentiary presumption that the judge imposed?  I'm not appealing from that. I'm complaining. Why would that be different? Why would it be different to impose a presumption that shifted the burden of proof, but not appropriate to strike certain kinds of evidence? Because the evidence that I submitted from the minister went to a unique issue, lack of subject matter jurisdiction. And subject matter jurisdiction cannot be exercised as a sanction. Is it? Is it? Well, but then . . . but so did the evidentiary presumption go to subject matter jurisdiction. That's what I'm questioning. Right. I mean, you're suggesting that no sanction that has any impact whatsoever on factual determinations going to subject matter jurisdiction would be appropriate. Isn't that the essence of your argument? Yes, that is. The sanctions could be imposed. Evidentiary sanctions could be imposed by excluding evidence that went to the merits, by excluding evidence that went to other factual issues. But the discovery that the sanction that was not provided, that led to the sanction, was exclusively discovery about subject matter jurisdiction. It is that issue on which your client has failed to produce evidence that would be highly relevant to making the factual determinations about subject matter jurisdiction. Until I produced the minister's statement, of course, which has a different character under vitamin C. Ah, ah, I see. Now, that's a different argument, I think. I think they're right. I wanted to see whether you were making that argument, that it's not necessarily . . . When one party refused to provide discovery about his or her domicile, you would not suggest, would you, that it would be improper for a court to impose a sanction precluding certain evidence that went to the subject of diversity? I don't think I need to go that far. Yeah. Because it's not just a fact. It's something that, if it qualifies, which is one issue under that doctrine, it would trump everything. It wouldn't be a factual issue anymore. Precisely. Precisely. By the way, so what happens to your argument if the Supreme Court should reverse animal products, which it's considering now on certiorari and will have a decision presumably this month? Three weeks, presumably. Well, I don't think the Supreme Court's pronouncement, whatever that might be, will affect this case because the Supreme Court may dilute the must-defer test that this Court set. But Judge Kogan, I'm not challenging his degree of deference. He refused to consider this at all. Yeah, but you see, then the minister's statement would revert, it seems to me, to the same category of evidentiary fact as a party's statement that I am domiciled in Massachusetts. Maybe, maybe not. Right now, here's how I look at vitamin C now. It's a tiebreaker. You have one side says, here's the law of a foreign country. The other side says, no, it's not. It's something else. And then the government comes in and breaks the tie and says, no, here's the real deal about our law, and the court must defer to that. I guess we'll find out from the Supreme Court whether that's the correct way of looking at it. Yes, but the Supreme Court may not reduce a minister's statement to the same level as just ordinary evidence. It might be must usually defer. So I think we have to wait to see how much of a trump card that still is. But nevertheless, because it's a trump card, and because it went to subject matter jurisdiction, Judge Kogan could not ignore it as a discovery sanction. And I repeat, I would like to contrast it with the Chinese government statement, which went to the merits. Chinese government said. The Chinese government appeared as an amicus in that case, isn't that correct? Yes, and so. Has Belarus appeared in any formal way in this proceeding? Yes, it has. It submitted the minister, when Judge Kogan refused. Submitting a statement is different from appearing as a party. Different from appearing as a party. So that's my question. Has the government of Belarus appeared in any formal status in this proceeding? It's not a party, and it's not an intervener, right? It is not. Is it an amicus? It has asked the embassy of the Republic of Belarus, acting as amicus curiae, hereby transmit a copy of the statement of the minister and the accompanying material. It's self-appointed amicus curiae. Yes. Is that right? Yes. So it hasn't obtained formal status. Let's talk about . . . No, actually, let me ask you a different question. What is the status of the proceedings in the district court? My notes suggested that jury selection is scheduled for June 25th, and proceedings are ongoing. Is that correct? That's right. Judge Kogan wants to take this case to trial. You've not moved for a stay? No. I would like to not antagonize the judge more than I have already. There is absolutely no way Judge Kogan was going to grant a stay, and I would merely antagonize him. So I'm not complaining about that state of affairs because it was my strategic choice. So I'm not here to complain about that. But that's why I didn't move for . . . To clarify. Yes. I made a strategic judgment that I didn't want to antagonize the trial judge any more than I already had. How many trial days are scheduled? Five. Judge Kogan was the trial judge in animal products. I didn't quite . . . I'm sorry. I didn't hear the question or the answer. The judge . . . I'm inquiring about the status of the proceedings in the district court. What was five? Five trial days are scheduled. Five trial days. Yes. And jury selection is scheduled for June 25th, just a couple weeks from now. Yes. That's right. You know, I'll just . . . one last point about the vitamin C case, and then I'll move on. I still have some more questions for you. All right. Go ahead. The minister's statement, I would like to suggest, merely restores the unanimity with which the United States is supposed to speak on issues involving foreign relations. Both political branches have said that my client is owned by the government of Belarus. It's the state-owned company. Now the judicial branch is going to hold otherwise? Wait, wait, wait, wait, wait, wait, wait. No branch of government of the United States has intervened in this case at all. Correct. No one has said that in the context of this litigation. You have a kind of . . . I mean, first of all, one issue is what is this entity? There's some controversy over whether it's one thing or another thing, and whether part of something with that same name is owned by the government or something else. And we've got something on a website somewhere from the United States government, don't we? I mean, what exactly . . . when you say the other branches of government, this is not a case. It's manifestly not a case in which, for example, the State Department has entered this case and stated any interest in it or said what it thinks about this. No. Would you like us to ask them? I would be pleased if you would ask them. Certainly. I would be pleased by that because the idea that Belnaft Ekim is not owned by the Republic of Belarus is . . . it's a fantasy. And the minister has told you that. You're relying on a report of the Congressional Research Service as a statement of Congress. Yes. Binding, right? Yes. Is there any statutory authority for that? Congress doesn't usually act through the Congressional Research Service in my experience. Sorry, it's an arm of the Library of Congress. It's a research branch. Yes. Is it authorized to make legally binding statements on behalf of the Congress of the United States? I'm quoting what it says from the public record. I'm not suggesting that it's necessarily binding. I'm saying that both . . . Well, you're saying that the legislative branch of the United States has made a pronouncement about the matter at issue in this case. And the question is, it hasn't. I mean, it's not the Congress. It's some scholars employed by Congress. Yes. That's it. You're right. So, anyway, I think it would be . . . You'd be very almost mechanistic. Let me go back to the district court's order . . . Yes. . . . which you believe was improper, right? Yes. Did the district court do what we said it could do? It went further than that. In what sense? It went further than that in that evidentiary sanctions . . . refusing to consider the minister's statement when it goes to subject matter jurisdiction . . . and is, at least until today, a trump card . . . goes beyond, quote, evidentiary sanctions. And, I contrast this to what the Chinese government did. You submitted that letter from the Belarus Ministry of Justice to the district court after it issued its first sanction order. Isn't that right? Yes. I submitted it on remand from this court, timely, on a motion to dismiss. After the remand, Judge Kogan set a schedule for my motion to dismiss the second amended complaint . . . and I submitted the minister's statement, timely, in accordance with that schedule. In response to Judge Carney's question about the amicus status . . . we're agreed that there was no application by the Belarus government to appear as amicus. You didn't file any such motion in its behalf. Correct. And, nobody else surfaced to say that they should be. Nor was opposing counsel asked whether they would have any objection to the filing of the amicus brief. That is true. And, it's my position that an appearance . . . Why do you think this is an amicus . . . that it even rises to the level of an amicus filing of some sort? They claim amicus status, but my position is amicus status is not necessary. It has never been necessary. We followed the procedure used in United States v. Pink. I mean, for all we know, this is a . . . I mean, I'm not suggesting malpractice on your part, but frankly . . . Thank you. This is . . . We're close. We're close. Give me a chance. The . . . I mean, this is the kind of document which in my former capacity as a resident of this great city . . . I would have thought could have been prepared before a notary public somewhere in Washington Heights . . . I'm not . . . I'm sorry. Or, even by someone who sells cigars. You're objecting to the lack of an oath? I'm just not . . . We just don't know anything about this document. Why can't I believe that it was manufactured in Washington Heights? It's submitted by the Embassy on official letterhead and with a copy to the State Department. Yeah. All right. Well, I mean, if that doesn't prove the bona fides, then . . . No. I mean, not if you grew up in New York, it doesn't. Judge, we followed the procedure used in Pink, which has never required an oath. Pink? Yes. Yes. That's a long time ago. Yeah. Reaffirmed in Animal Science two years ago. Understood. Right? The process is the party asks its government for a statement of law . . . And why don't they appear in some formal way, which doesn't suggest that it was somewhere in Jackson Heights or Washington Heights? I can't answer why . . . One of the Heights. One of the Heights. I don't represent the government. I represent Belknap Deckeman. What I can tell you is, I read the cases and I followed the procedure in the cases. That is not the procedure that was used in Vitamin C, is it? No. But Vitamin C doesn't say that's required. Vitamin C says there was an oath. It's obviously sufficient. But Vitamin C never says an oath is required. And Vitamin C doesn't say an appearance is required. That's what happened there, but it doesn't say it's required. And Vitamin C reaffirms Pink, which is where the lawyer for the party obtained the statement from the foreign government of law, unsworn, and submitted it. Counsel submitted it as an exhibit to a declaration. That's what I've done here, and that's frankly what I've done repeatedly. Bruce, I was just looking back at our previous opinion . . . Yes. . . . which said that two alternative sanctions were available. One, according an evidentiary presumption against defendants that the withheld discovery would refute their claim that BNTK is an organ or instrumentality of Belarus. And two, prohibiting defendants from offering further supporting evidence on that issue. It didn't say anything about a sanction to prevent the offering of other evidence on the merits. But that is . . . But there is an implicit exception for the issue of subject matter jurisdiction. That's the issue. That's what that issue was, was the issue of subject matter jurisdiction. That is the issue on which we said the district court had overstepped by flatly precluding the defense of sovereign immunity. Let me read another part. Sorry. We said there were alternative things that could be done, including prohibiting defendants from offering further supporting evidence on that issue. Yes. But you also said, insofar as defendants were denied FSI immunity . . . as a discovery sanction, a concern arises that the district court may have conferred subject matter jurisdiction on itself, where it may have been lacking. Right. And that's exactly what happened with the defense. But what you're saying is, in effect, the same thing as saying that a party may not be sanctioned to preclude evidence about residents if that party, in a diversity case, withholds discovery on that issue. That's what you are saying. No, I'm not. At least I'm not saying that. What I'm saying is . . . That goes to subject matter jurisdiction. So what's the difference? The difference is vitamin C, as we discussed five or ten minutes ago. Okay. So that's the real point. The issues are meshed, in my view. That it goes to subject matter . . . This is a special kind of statement that is not evidence, because maybe it wouldn't even be admissible as evidence in the form in which it is. But the thunderbolt on letterhead stationary from the embassy is something entirely different than evidence that can be precluded. Yes, precisely. We'll see whether the Supreme Court . . . May I address a couple of the other issues or not? A couple of other questions. Okay. Just to make sure that I have this straight. We're hearing appeals from orders of August 22, September 5, November 20, and December 15. Is that right? Yes. All right. And you're claiming that we have interlocutory appellate jurisdiction. Is that right? Yes, under the collateral order doctrine. All right. And in what way do any of these orders resolve an important issue completely separate from the merits of the action? Well, the threshold sovereign immunity determination is immediately appealable under the prior panel's decision in this court, and in this case, and many others. The other . . .  I'm sorry. You've decided this already, the Atlantic Richfield case, the merit case. Let's go back to the collateral order doctrine. These don't conclusively determine the disputed question. You could bring in an appeal and do a course, right? Yes, but the denial of a motion to dismiss on the ground of sovereign immunity is clearly appealable under this court's precedence. Did you understand that the district court made a final ruling about sovereign immunity? Yes. There's no further ruling. It's not temporary or contingent. You made a motion to dismiss on grounds of sovereign immunity, and the bottom line of at least the November 20 order is that motion to dismiss is denied. Exactly. So that clearly qualifies under the collateral order doctrine. Take one minute, and then we'll hear from opposing counsel. Sorry. I have one minute? Yeah. I've given you over ten. That's fine. Treat. Treat. Thank you, Judge. Let me go to this point about the organ factor, which is distinct from the ownership factor, and the minister's statement largely goes to ownership. We made a submission in the district court which showed prima facie that we satisfy the five filler factors for organ status. In opposition, the plaintiffs submitted nothing, nor did they challenge any of the translations on those issues. In this court, the plaintiffs point to nothing. I don't understand why I don't win on that record. I made a record that this court said was prima facie sufficient, and there's no rebuttal. There's no opposition. Judge Kogan lumped the two together, and that's an error. Let's look at what Judge Kogan said here. I will presume that the withheld evidence would have established certain facts. Where are you reading from? I'm reading from S.P.A. Special Appendix 16, which is Judge Kogan's denial of my motion to dismiss. I'll presume that the evidence would have established certain facts. First, that the government of Belarus exerts authority over Belnaftek, but not ownership. And second, that while some portion may be owned by the Council of Ministers, there's another commercial entity that is different. So Belnaftek is not majority-owned or an organ. Now, that last phrase is a non sequitur. Just because Belnaftek is not majority-owned doesn't mean it's not an organ. The factors are different. And in this case, the record that my client satisfies the organ factors is undisputed. And I've argued that in the district court. No one's ever told me why I'm wrong. I realize everybody's angry that we didn't produce discovery. Just wait. You may find out. Okay. Thank you. Thank you, Judge. Thank you. Mr. Zeltser, what have you got to say about all of this? Good morning, Your Honor. What we have here is essentially the repetition of the last appellate argument. Every issue that my opponent presented here is set forth meticulously in the decision of this court of June of last year. This court specifically provided a roadmap for the district court as to how to deal with those issues without offending the sovereign immunity. The district court followed the instructions of this honorable court to the letter precisely. Now, to address Mr. Caruso's so-called minister statement, forgetting about the fact that it was presented totally improper, it's not an amicus because amicus, according to Rule 29, has to comply with certain rules. Either we have to agree with that or this honorable court has to approve it. Otherwise, it's not even an amicus. And what Your Honor stated about this being created somewhere in Washington Heights is exactly what I was going to say. Now, the so-called minister statement is really a compendium of unsworn, it's not presented properly, it's a compendium of letters from various entities that Mr. Caruso purports to be governmental entities. Now, we don't even know where this statement, there is no affirmation that this particular person is, in fact, minister of justice. All we know about minister of justice of Beryl Bruce is that he is one of the persons just like Bill Nifty came under sanctions of the United States. Otherwise, we don't know who that person is. But, even assuming that the statement is authentic, even assuming that all those compendium of letters from various government agencies on properties are in fact government entities, and I don't know who they are, and I know a lot about Belarus. Now, even assuming all that, the so-called minister statement is talking about an entity of 165 employees. Clear, big as life, 165. The Bill Nifty we are suing has 138,000 employees in 40 countries manufacturing their products, selling the products in 90 countries around the world, and manufacturing over 500 products, that's on their website. So, if it was in fact 165 employee agency, each employee would have to manufacture at least one line of tractors and another line of gigantic trucks. So, it's not the entity we are suing is not 165, and we are not even denying there may be a 165 person entity under the same name. Here's the important factor, okay, because I happen to, my native language is Russian. Bill Nifty Kim is a generic name. It means Belarusian petrochemical industries. It can be used as a brand name as well. It's true. Therefore, yes, it is possible that in its generic form there is a 165 men government organ. That's not the one we are suing. Nothing to do. We are suing the company that doesn't have 165 employees as Mr. Minister of Justice, assuming he is a Minister of Justice, is talking about. He submitted a statement. I'm not even talking about it being completely belated. I'm not talking about it being completely unacceptable for. All I'm talking about is that even assuming that it was properly submitted, it was proper amicus, it was proper in every respect and authentic in every respect, it still is talking about completely different entities, not talking about 138,000 employee entities that we are suing. Thank you. Thank you. Russo, you've reserved three minutes. Yes. I'll rebut briefly. It is simply incorrect to say that the prior decision of this court decided all the issues that I'm raising here because the vitamin C issue was not before the court last time. We've aired that out now. I'm happy to talk about it further, but the prior panel decision does not decide that point. The second point that the prior panel decision does not decide was the lack of removal jurisdiction. Judge Kogan's decision saying that my client is not an agency or instrumentality of the Republic of Belarus has certain consequences. And one of them is he's not allowed to exercise diversity jurisdiction, which he's doing. Because if you remove a case on ground, my client removed this case on one ground. Wait, didn't one of your clients remove the case on grounds of diversity? Yes, but we have to distinguish they're two different companies. So one company goes back to state court and the other company stays in federal court? That may be something that Mr. Zeltser might not like, but that can happen, yes. But equally, equally under the . . . Why do we have, by the way, pendent appellate jurisdiction over that? That's not intertwined in any way with the issues that you're primarily raising. And I don't think it's something that goes to the subject matter jurisdiction. It goes to the technicalities of removal. No. It goes, according to Lupo, and a case that Your Honor wrote, Arancio, as a district judge, it goes to subject matter . . . I used to get reversed from time to time when I was a district judge, so I'm not sure that I was necessarily right. No, but there you have faithfully followed Lupo. Because Lupo says, because the defendant failed in its notice of removal to even raise the issue of diversity jurisdiction, we lack subject matter jurisdiction over the present case. So it's not a technicality of removal practice. If the defendant says, I remove on ground A, and the district judge says, I don't have jurisdiction on ground A, then the district judge cannot exercise jurisdiction on ground B, which is what Lupo says, which is what Arancio says, and which is what Judge Kogan is doing. That's error. And that was not at all part of the prior record. All right. That's something that arose strictly out of the nudes of the current decision that's on appeal. Now, let me go finally to this point that Mr. Zeltser was making about . . . I didn't grasp what you were saying. But we have here documents that are on the official letterhead of these government agencies. We have apostilles signed under the Hague Convention. And if Judge Kogan had followed normal procedures, then any of these defects, I would have had an opportunity to cure. But Judge Kogan reached out and plucked this issue out. Suus pompti. I made a motion filing these minister statements on August 16th. On August 22, six days later, he just reached out and plucked that issue out for special treatment and said, that's wrong. Mr. Crusoe is wrong. That's out of the case. So, I never had an opportunity to be hurt, to have the other side say, here are the defects. And then in normal practice, I would come in on reply and say, I can cure those. But you've dealt with sanctions cases before where district judges go too far. And I think, and you've said, you need to be cautious about that because of the concentration of power. I think plucking this issue out, suus pompti, a mere six days after I raised it, shows that he kind of went out of his way to say, you know, I'm not going to dismiss this case. I'm just not going to do it. Let's go back to this apostille. Yes. How did you get this document from Belarus? Just give us a little chronology of your interaction or your colluding with Belarusians. I worked with the embassy. I spoke to people at the embassy in Washington. I told them we needed a statement of law about the, as of July 12, 2012, which is the relevant date under Dole, the case, the day they started the case. And I said, you know, here's what we need. And they already had a copy of the affidavit and declaration materials that I had submitted of my client in the prior case. And they drafted this. And how did they get it to you? The embassy gave it to me. Gave it to you? To me. By hand? Yes, by hand. The embassy gave it to me. And did you then consider how you were going to present this to the court? Yes. I thought very hard. Excuse me? I thought very hard about that. And I did what Pink requires. You know, there has never been a requirement that the foreign country appear. But you didn't suggest to them anything other than the preparation of this letter? Correct. And the subject matter. And is the Minister of Justice of Belarus in a position to determine questions of American law under the FSIA? No, of course not. But that's not what he's speaking to. Well, he's giving legal conclusions of various types and is being descriptive of it's a state organization subordinated. It's a state association. He refers to individual entrepreneurs. It seems to be kind of a description of some aspects of how Beel Neftekim is organized under the law of Belarus. Yes, and he's perfectly competent to tell us what the law of Belarus and how this client company is organized under the law of Belarus. He's not stating U.S. legal conclusions. I mean, I point to the following. Beel Neftekim is a state organization subordinated to the government of the republic. That goes to a filler factor. And, you know, that's a statement of Belarusian law, not U.S. law. In accordance with the legislation of the Republic of Belarus, Beel Neftekim is vested with a number of state functions, like control over the licenses of petrochemical companies, regulation of the prices of petroleum products. This is on A410. Does this document, in your view, exclude the possibility described by Mr. Zeltser that there are aspects or components of Beel Neftekim that are, in fact, primarily or predominantly privately owned? I think it does. You think it does? I do. First of all, I think this whole idea that there are two companies is preposterous and not at all supported by any of the evidence or by this. What about that letter itself saying that this is a far-flung enterprise that does all these various things in petrochemicals, et cetera, et cetera, but only has 165 employees? The discovery record shows what's going on here. Beel Neftekim is the state company, and it supervises all these other companies that manufacture things, some of which are state-owned, some of which are commercially owned. That's in the discovery that we provided. So your argument really is Mr. Zeltser sued the wrong company? No. Mr. Zeltser sued the one company that exists. He filed an action. What about all those other companies that you just said it supervises? Well, right, but he doesn't have a claim against those companies. Those companies have all different names and all different duties. They do lots of different things. They're not subsidiaries. Why couldn't all that be provided in discovery so that we would know those facts? You just said that, but I don't see anything in the record that describes what all those entities are and aren't. The very issue on which discovery was requested is the structure of this organization. I understand, but I'm not going to go into why I was unsuccessful in inducing participation in the discovery at that stage. I have been very successful at this latter stage on the merits discovery, in part because the clients have seen the wrath of what comes down when you don't cooperate. But I can't revisit that now without going into what I think is privileged material. But let me just say that he sued one company. It's called Concern Belknap-Decken. The address is in the record, 73 Dzerzhinsky Boulevard, Minsk, Belarus. Dzerzhinsky Boulevard. That's great. That's where he served, but that's where he served process. There's only one company, and he served that company, and I'm representing him. We hardly knew him. Right. I think perhaps I've worn out my welcome. Thanks very much, Mr. President. Thank you, Your Honor. Always good to see you. Thank you. It's good to be here. Thank you.